IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ANTHONY VIGIL,

        Plaintiff,

  vs.                               CIVIL NO.  10-947 LFG/WDS

JEFFREY T. STONE and
CHRIS SILVA, Officers of
the Albuquerque Police
Department, individually,

        Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING DEFENDANTS' MOTION FOR A SANCTION
## AND DISMISSING ACTION WITH PREJUDICE

THIS MATTER is before the Court on Defendants' Motion to Dismiss Plaintiff's Complaint as a Sanction for Plaintiff's Perjury During Discovery [Doc. 39].  The Court considered the motion, Response [Doc. 48], and Reply [Doc. 49].  Oral argument is not necessary.

### Introduction

Plaintiff Anthony Vigil ("Vigil") seeks monetary damages from two City of Albuquerque police officers, Jeffrey T. Stone ("Stone") and Chris Silva ("Silva"), for alleged constitutional and common law violations.  Vigil's lawsuit alleges wrongful arrest, wrongful search and seizure, excessive force in violation of the Fourth and Fourteenth Amendments, and state claims of assault and battery.  [Joint Status Report ("JSR"), Doc. 12 at 2].

### Parties' Contentions

Vigil contends that, while driving on January 15, 2008, he was stopped by Stone and Silva "with no reasonable suspicion or probable cause for the stop."  [Doc. 12, JSR, at 3].  Due to a prior

bad experience in a citizen/police encounter, Vigil states that when the officers "surrounded the plaintiff, and approached him in a threatening and intimidating manner, he fled for his own safety. While fleeing, he did not have any weapons or objects that could be used as a weapon."  [Id.]. Nonetheless, he says that Stone drew his service revolver and shot him four times.[1]

Vigil alleges the officers lied about him having a knife, and, thereafter, "falsely and knowingly charged or caused the Plaintiff to be charged with alleged crimes related to the incident, including assault on a police officer, and resisting arrest, which resulted in him being wrongfully detained [and] imprisoned . . . ."  [Doc. 12, JSR, at 4].

Defendants recount the events in question differently.  For his part, Silva, who initiated the traffic stop, observed Vigil engage in multiple driving offenses, including driving at a high rate of speed, and, accordingly, contends he had good cause to stop him.  When Silva asked Vigil about his high rate of speed, Vigil said he was rushing to UNM Hospital ("UNMH") because his wife, Luanna Abeyta, suffered a heart attack. [Doc. 12 at 4-5].  Vigil had no driver's license, but provided Silva with a social security number that, when checked, did not match the name given and was not the social security number assigned to Vigil.  Further, when UNMH was contacted by APD dispatch to check on Luanna Abeyta's condition, dispatch was told that UNMH had no patient by that name. Thus, with the driving infractions observed, Vigil's misinformation concerning his identity, and the false statements about his wife at UNM Hospital, Silva called for back-up assistance.  [Id. at 5].

Stone was the back-up officer and, as he was arriving, Silva again approached Vigil and told him that the social security number he provided was not assigned to him.  Vigil gave Silva a second

---

[1]Defendants assert in their reply brief that Vigil's claim that he was shot four time is untrue.  He was shot by Officer Stone one time when the officer perceived himself and Silva to be at immediate risk of an assault, battery or death.  One bullet struck Vigil in the abdomen. [Reply brief at 1].

social security number, but, before Silva could check on the new number, Vigil started his car and fled the scene.  [Doc. 12 at 5-6].

Silva and Stone began an auto pursuit.  However, after calling in their status to APD dispatch, a supervising sergeant directed them to disengage from the pursuit.[2]  The officers terminated their pursuit, turning off emergency lights and sirens, but they kept looking for Vigil in the residential area where he was last seen.  [Doc. 12 at 6].

Silva located Vigil's vehicle stopped in front of a residence.  As he approached the car, Vigil fled his vehicle, running between houses.  Vigil attempted to climb a fence with Silva and Stone now in foot pursuit.  Silva, while nearing Vigil, ordered him to stop, yelling, "stop, let me see your hands, turn around, let me see your hands!"  [Doc. 12, JSR at 6].  Vigil did not comply and, instead, reached into his jacket, turned quickly, faced Silva and Stone, and drew a black object from his jacket.  He rushed toward the officers.  Seeing the dark object in Vigil's hand as Vigil was closing the distance, and believing it was weapon and that they were in danger of an immediate battery or even death, Silva raised his firearm to shoot.  But before he could do so, Stone fired a single shot with his firearm, striking Vigil in the abdomen.  When the officers subdued Vigil, they found a black-handled steak knife next to him and within arm's reach.  [Id. at 6-7].

The defense theory of this case is that, on January 4, 2008, 11 days prior to the occurrence of the events described above, officers sought to arrest Vigil on an outstanding warrant.  [Doc. 42, Tony Vigil Depo., Ex. 2 and Ex. 16].  Vigil successfully fled arresting officers and avoided arrest. The defense contends that, on January 15, 2008, the night Vigil was stopped, he knew he would be

_____

[2]Due to the risk of harm to the public, to the person being pursued, and to the officers, many municipalities adopted standard operating procedures that do not allow high-speed hot pursuits in cases involving non-violent crimes. *See, e.g.*, County of Sacramento v. Lewis, 523 U.S. 833 (1998).

arrested on the outstanding warrant as soon as officers learned his true identity. The knowledge of the warrant prompted Vigil to lie about his identity and flee to avoid arrest.

At his pretrial deposition, Vigil denied alluding the police during the earlier January 4, 2008 attempted arrest, and claimed that there was no outstanding warrant for him. [Tony Vigil Depo. at 49:6 through 50:9]. Rather, he claimed that his younger brother, Ernest Vigil, stole his identity and committed several crimes using Tony Vigil's identity. [Tony Vigil Depo. at 44:10 through 45:14]. Thus, Vigil claims that the warrant was really for his brother, Ernest. Because of Vigil's denial that there was an outstanding warrant or that he had committed crimes, Defendants sought to obtain information about Vigil's criminal history. Defendants served written discovery and took Vigil's deposition.

## Untruthful Discovery Responses

In pretrial written and oral discovery, Vigil made numerous statements under oath which are flatly contradicted by the record, documents, and the sworn testimony from him and others. With substantial evidence in hand that Vigil lied in pretrial discovery, Defendants filed this motion to dismiss as a sanction. [Doc. 39].

Vigil does not dispute the representations concerning his misstatements under oath. [Response, Doc. 48]. He does, however, oppose dismissal of his Complaint, contending that "as a result of his severe and extended illness resulting from the incident [that gave rise to the lawsuit], he now suffers from 'poor memory,'" [id. at 6-7], and that his false answers during pretrial discovery resulted from medication. [Id.]. He admits making false statements under oath, but contends that his statements were not made with the intent to deceive; instead, they were simply the product of his poor or impaired memory caused either by medication or by the Defendant officers' conduct.

4

Among the complained-of alleged misrepresentations are the following:

Vigil was asked in Interrogatory No. 8 if he had "ever been charged and/or arrested for a crime." Vigil responded by listing only the criminal charges filed in this case, and one single prior felony charge in 1977 or 1978 for forgery/fraud. [Tony Vigil Depo., Ex. 1, Plaintiff's Answer to Interrogatory No. 8]. [Doc. 42, Ex. 1 at 2-3].

At his deposition, Vigil was again asked about his arrest history. This time, Vigil stated he had been arrested five times. [Tony Vigil Depo. at 37:7-17]. But, with the exceptions of the charges previously indicated in his interrogatory response, he claimed that four of these arrests were for traffic violations, and not for any felony charges. [Id.; Doc. 42, Ex. 2 at 74-75].

Vigil was shown Exhibit 5, a Guilty Plea Proceeding out of the First Judicial District captioned, State v. Anthony Vigil, SF 87-232 CR, and SF 87-339 CR. The Indictment was brought against "Anthony Vigil" and the Guilty Plea document is signed "Anthony Vigil." [Doc. 42; Ex. 5 at 2]. When questioned about the criminal charges and the Guilty Plea Proceeding, Vigil denied knowledge of the charges and guilty plea, and denied signing the agreement. In explanation, he testified that he does not use the name "Anthony Vigil," and always signs documents as "Tony Vigil." Thus, as the document was signed "Anthony Vigil," he claimed that the document was not signed by him. [Tony Vigil Depo. at 77:3-10].

The plea agreement [Ex. 5] was intended to resolve two separate felony cases: SF 87-232 CR and SF 87-339 CR. Vigil's name, social security number and address are all listed in the plea documents.

The plea of guilty was to a felony offense of forgery, as charged in Count I of SF 87-232 CR. Counts II through IX of SF 87-232 CR, as well as Count I of SF 87-339 CR, were dismissed. [See Doc. 42; Ex. 6 at 1-2]. When again asked about this plea agreement [Ex. 5], he denied being

5

convicted of any crimes set out in 87-232 and 87-339, and contended that it was his brother, Ernie, who committed the crimes, signed the plea agreement and was convicted.  [Tony Vigil Depo. at 76:14 through 77:22].

Vigil was then shown Exhibit 6, the Plea and Disposition Agreement in SF 87-232 and SF 87-339.  This is the Agreement leading to the Guilty Plea Proceeding identified in Exhibit 5.  The defendant identified by the Grand Jury was Anthony Vigil, and the defendant signed his name "Anthony Vigil."  Vigil again denied that he was the one who committed the crimes or signed the guilty plea proceeding or was convicted. [Tony Vigil Depo., Ex. 6 at 78:4-20].  He contended that this was not his conviction, but his brother's, and that his brother stole Vigil's identity.

Vigil was shown Exhibit 7, which is another Plea and Disposition Agreement in two other criminal cases in the First Judicial District Court, SF 88-286 CR, and SF 88-364 CR.  The plea of guilty was to forgery in the third degree. In exchange for the plea, the State would dismiss a charge of escape in the fourth degree, and would not bring a habitual offender proceeding.  The Plea and Disposition Agreement was signed on February 10, 1989.  Vigil denied that he signed Exhibit 7, the Plea and Disposition Agreement.  [Tony Vigil Depo. at 79:10-18].

Exhibit 8, is a Repeat Offender Plea and Disposition Agreement in two more Santa Fe cases–SF 95-256 CR and SF 94-110 CRl. Pursuant to this Repeat Offender Plea and Disposition Agreement, the defendant would plead guilty to (1) a fourth-degree felony offense of fraud, occurring on April 25, 1993, as charged in Count I of a Grand Jury Indictment, SF 94-110 CR; (2) a third-degree felony offense of fraud,  occurring between September 23, 1994 and September 30, 1994, as charged in Count I of a Grand Jury Indictment in SF 95-256 CR; and (3) a fourth-degree felony offense of fraud, occurring between September 24, 1994, and October 7, 1994, as charged in Count II of Indictment SF 95-256 CR. [Doc. 42; Ex. 8].

This Repeat Offender Plea and Disposition Agreement, as the others before it, bears Vigil's date of birth, social security number (ending in 7031), and his address in Pojoaque, New Mexico.

Significantly, this plea agreement, Exhibit 8, contains the following language:

> The Defendant further agrees to admit his identity as the same person previously convicted of the Felonies:
> PRIOR FELONY CONVICTION NUMBER 1:
> NAME OF FELONY:  Forgery
> DATE OF OFFENSE:  November 12, 1987
> DATE OF CONVICTION:  February 10, 1989
> CRIMINAL CAUSE NUMBER: SF 88-286 (CR) and SF 88-364 (CR)
> COUNTY OF COURT: Santa Fe, New Mexico
>
> PRIOR FELONY CONVICTION NUMBER 2:
> NAME OF FELONY: Forgery
> DATE OF OFFENSE: September 26, 1986
> DATE OF CONVICTION: October 14, 1987
> CRIMINAL CAUSE NUMBER: SF 87-232 (CR) and SF 87-339 (CR)
> COUNTY OF COURT: Santa Fe, New Mexico

[Tony Vigil Depo., Ex. 8 at 2].

During his deposition, Vigil stated that the signature on Exhibit 8 was his.  [Tony Vigil Depo. at 80:9-16].  Yet, these cases are the very ones Vigil claimed were committed by his brother, and for which he maintains his brother was convicted.  Vigil's admission of identity as being the same person who committed the crimes, signed the agreements and was convicted of these felonies is contrary to his sworn testimony that he was not the person convicted of these offenses, but, rather, that his brother was the one who signed the plea and was convicted.

Vigil was shown Exhibit 9, another Repeat Offender Plea and Disposition Agreement arising out of the First Judicial District Court, State of New Mexico v. Tony Vigil, No. D-0101-CR-2002-350.  This Agreement contains the name "Tony Vigil," Vigil's date of birth, a social security number ending in 7031, and his address at the Santa Fe Adult Detention Facility.  Pursuant to this

7

Agreement, Vigil agreed to enter into an <u>Alford</u> [3] plea to the offenses of (1) stalking Judith Jill Vigil on or between February 1, 2002 and April 2, 2002; (2) criminal damage to property under $1,000, with the victim again identified as Judith Jill Vigil; (3) aggravated battery with a deadly weapon, specifically, a motor vehicle, against Judith Jill Vigil; and to the unlawful taking of a motor vehicle over $2,500, a third-degree felony offense.

As part of this Agreement, Vigil admitted that he was the same person convicted of:

> 1.  Forgery (two counts), both felony offenses, occurring on or about September 26, 1986, in Case Number SF 87-232 and SF 87-339, and convicted on or about October 14, 1987, in the First Judicial District Court.

> 2.  Forgery (two counts), both felony offenses, occurring on or about November 12, 1987, in Case Number SF 88-286 and SF 88-364, and convicted on or about February 10, 1989, in the First Judicial District Court, defendant placed on parole on August 29, 1990, parole revoked on August 6, 2001.

> 3.  Fraud, a fourth degree felony offense, occurring on or about April 25, 1993, as charged in Count I of the Grand Jury Indictment in SF 94-110; Fraud, a third degree felony offense, occurring on or about September 23, 1994, as charged in Count I of the Grand Jury Indictment in SF 95-256; Fraud, a fourth degree felony offense, occurring on or between September 24, 1994 and October 7, 1994, as charged in Count II of the Grand Jury Indictment in SF 95-256, and convicted on all counts on or about June 27, 1995, and unsatisfactorily discharged from probation on both cases on March 20, 2002.

[Tony Vigil Depo., Ex. 9 at 2-3].

---

[3] An "Alford" plea derives from <u>North Carolina v. Alford</u>, 400 U.S. 25, 91 S. Ct. 160 (1970).  In entering an <u>Alford</u> plea, a defendant acknowledges that the prosecutor is able to prove facts, beyond a reasonable doubt, to sustain a conviction.  Therefore, a defendant makes a knowing, willing and intelligent choice between available options and, recognizing the strength of the prosecutor's case, pleads "no contest" to the charge, generally, in return for some concession.  <u>Alford</u>, 400 U.S. at 38-39.

The admissions of these prior felony convictions contradict Vigil's sworn Answers to Interrogatories and deposition testimony that he was not convicted of those prior offenses, but, instead, that his brother committed the crimes, signed the relevant documents, and was convicted.

The plea agreement identified in Exhibit 9 involved the commission of crimes against Judith Jill Vigil.  When asked about Judith, the victim of these crimes, Vigil first claimed he did not know her and then said he may have met her on one occasion.  He then testified that Judith Jill Vigil was really his brother's wife.  [Tony Vigil Depo. at 84:15-16].

This testimony is flatly contradicted by Judith Jill Vigil who testified that she (1) was married to Tony Vigil, the Plaintiff herein [Tony Vigil Depo., Ex. 18, Judith Jill Vigil Depo. at 7:8-9]; (2) never met nor was she ever married to Vigil's brother Ernest [Judith Jill Vigil Depo. at 11:4-7]; and (3) was the victim of the aggravated stalking committed by her husband, Tony [Judith Jill Vigil Depo. at 23:15-24].  In February 2002, she filed a Petition for Dissolution of Marriage and obtained a Final Decree of Dissolution of Marriage from Vigil in June 2002 in the First Judicial District Court, case number  D01-01DM20020 0183.  [Tony Vigil Depo., Ex. 19 and 20].  This evidence categorically refutes Vigil's claims that (1) he didn't know Judith Jill Vigil; (2) had never met her or had met her just once; (3) they were not married; (4) he did not commit any crimes against her; and (5) Judith was married to his brother, Ernest.

Vigil was also shown Exhibit 10, which is another Plea and Disposition Agreement arising out of the First Judicial District Court in No. D0101 CR 2003-0485.  In this case, he agreed to plead guilty to shoplifting in return for a time-served sentence and supervised probation, conditioned on his undergoing substance abuse counseling and treatment.  Yet, at his deposition, Vigil denied that he was the individual who signed the Plea and Disposition Agreement, notwithstanding the fact that it bears his name, date of birth, address and social security number.  [Tony Vigil Depo., Ex. 10].

Vigil entered yet another Repeat Offender Plea and Disposition Agreement in March 2008 in the First Judicial District Court in No. D-0101-CR-200500196. [Tony Vigil Depo., Ex. 11]. He was to plead guilty to a fourth-degree felony, aggravated fleeing from a law enforcement officer. Of significance, he agreed that he was the same person previously convicted of the misdemeanor shoplifting offense in Count I of D-101-CR-2003-00485 referred to above, and the unlawful taking of a motor vehicle, a fourth-degree felony as charged in Count I of D-101-CR-200200350 (the crime involving Judith Vigil). The Indictment in this case names Tony Vigil as the defendant, and defendant signed the Agreement as Tony Vigil. Vigil denied, under oath, that he signed this document. [Tony Vigil Depo. at 86:13 through 87: 11-12].

Exhibit 12 is another Plea and Disposition Agreement from the Fourth Judicial District Court, San Miguel County, No. 2003-151-CR. The Agreement contains Vigil's name, date of birth and social security number ending in 7031, and his address in Pojoaque, New Mexico. Pursuant to this Agreement, Vigil pled guilty to Count I, receiving or transferring a stolen motor vehicle, and in the same Plea and Disposition Agreement, acknowledged that his date of birth was indicated in the plea agreement.[4] He acknowledged that he was previously found guilty of fraud in cause numbers SF 95-256 CR and SF 94-110 CR. These are convictions which Vigil claimed belong to his brother.

---

[4]Vigil's birth date is not set out in this Memorandum Opinion due to privacy issues. So, too, his full social security number is not included for the same concerns. The Court has, however, judicially noticed such state court documents as Guilty Plea Proceedings; Plea and Disposition Agreements; and Repeat Offender Plea and Disposition Agreements, and finds that the dates of birth and social security numbers in all of these pleadings are consistent. *See, e.g.*, United States v. Estep, 760 F.2d 1060, 1063 (10th Cir. 1985) (courts may take judicial notice of records from other courts). In other words, the names, date of birth, social security numbers, and home address in the plea agreement Vigil admits signing are identical to the ones included in the documents he denies signing.

In the Plea and Disposition Agreement in No. 2003-151CR, Vigil also acknowledged that he was the same person convicted of one prior felony. He agreed to serve a habitual enhancement of one year, and thereafter receive a suspended sentence. [Tony Vigil Depo., Ex. 12]. At his deposition, Vigil conceded that the signature on that Plea and Disposition Agreement (Ex. 12) "might" be his. As a result of signing the Plea and Disposition Agreement marked as Exhibit 12, Vigil admitted his identity as the same person previously convicted of felonies in SF 95-256 CR and SF 94-110 CR, which are convictions he previously denied.

Exhibit 13 is yet another Plea and Disposition Agreement, this one relating to the charges resulting from the incident (criminal cause number 08-00602) giving rise to the present lawsuit. In this Agreement, Vigil agreed to plead no contest to (1) assault upon a peace officer, a lesser included offense of Count 1; (2) resisting, evading or obstructing an officer, a misdemeanor offense; and (3) concealing identity, a petty misdemeanor.[5] Pursuant to the plea agreement, Counts 2, 4 and 5 of Indictment in CR No. 08-00602 would be dismissed. [Tony Vigil Depo., Ex. 13]. The name, social security number and date of birth are consistent with prior plea agreements which Vigil denies signing.

Vigil waived his right to appeal so long as the sentence imposed was in accord with the terms of the agreement. His admission that evidence existed from which he could be convicted of the offenses of (1) assault upon a peace officer; (2) resisting, evading or obstructing an officer; and (3) concealing identity, belie allegations in his Complaint that there was no probable cause or that he was falsely arrested. These crimes all grew out of the incident that gave rise to his present lawsuit.

---

[5]Having been convicted of the very charges giving rise to this lawsuit, Vigil does not explain how he can proceed with claims of false arrest, wrongful search and seizure, or assault and battery. *See* Heck v. Humphrey, 512 U.S. 477 (1994).

Curiously, during his deposition, Vigil was shown Exhibit 13 in <u>State v. Anthony Vigil</u>, CR No. 08-00602, and he claimed that someone else signed the plea agreement because he did not appear in court.   [Tony Vigil Depo. at 91:21 through 94:3].   Yet, contrary to his sworn representation, a transcript of the plea proceeding states, "The Defendant, ANTHONY VIGIL, appeared *in person* and by Counsel of Record, RAYMOND MAESTAS . . . ."  [Tony Vigil Depo., Ex. 16, Transcript of Proceedings at 1](emphasis added).   The transcript further indicates that the judge asked Vigil if the signature on page 4 of the Plea and Disposition Agreement [Tony Vigil Depo., Ex. 13] was his, and Vigil responded, "Yes, sir."  [Tony Vigil Depo., Ex. 16, Transcript at 5, lines 16-17].   This evidence contradicts Vigil's testimony that he neither signed the plea agreement nor appeared in court.

In Interrogatory No. 8, Vigil listed Case No. D-202-CR-200800602 as one of the cases for which he was charged and/or arrested for a crime, and he indicated that he pled no contest to the charges identified in the plea agreement in this cause.  [Tony Vigil Depo., Ex. 1 at 3].  The Offender Booking Sheet [Tony Vigil Depo, Ex. 16, Ex. 38] contains a picture of the individual arrested for that crime, and Vigil admitted that he was the individual depicted in the booking photograph.  [Tony Vigil Depo. at 168:12-15].  The Booking Sheet also identifies Vigil's date of birth, social security number, and address, which are the same identifiers on each of the prior plea agreements which Vigil claims he did not sign.  This Booking Sheet with his photo relates to criminal charges in case numbers 10-91-08, CR 2008-602 and CR 05-0196. [Ex. 38], the very offenses he alleges were committed by his brother.

## **Fingerprints and Signatures**

A forensic scientist, Becky Archuleta, reviewed fingerprint cards labeled A, B, C, D, and E from Tony Vigil, aka, Anthony Vigil, and concluded that each fingerprint card (A from the MDC

12

booking on January 24, 2008; B from a shoplifting charge; C, from cases SF 95-256 CR and SF 94-110 CR; D from case numbers SF 87-232, SF 87-339, SF 88-286, and SF 88-364; and E from case numbers SF 87-232, SF 87-339, SF 88-286 and SF 88-363) all came from the same person--Plaintiff Vigil.  [Tony Vigil Depo., Ex. 17, Affidavit of Becky Archuleta and attachments].  Vigil offered no explanation as to how his own fingerprints are on all of the fingerprint cards from all those cases if the crimes were committed by someone else.  Moreover, a comparison of all signatures on all the prior plea agreements identified herein, whether signed "Anthony Vigil" or "Tony Vigil" show that the writing is the same and all signatures were signed by the same person.

### Medication

To refute Vigil's current claim that his responses were the product of medication, the reply brief notes that, at Vigil's deposition, he was asked if he was under the influence of alcohol, drugs, medication or any chemical substance that would affect his ability to remember or testify, and he said, "no."  [Vigil Depo. at 8:7-10].

Vigil submitted no medical evidence by way of a doctor's affidavit or medical report indicating that he suffers from memory loss or impaired memory due to medication or any action by Defendants.  Indeed, the only medical records before the Court [Doc. 48-1 at 15-17] make no mention of memory loss or lack of capacity.

### No Corrections

Silva and Stone also note that at the conclusion of Vigil's deposition, he requested, through his attorney, an opportunity to review and sign the deposition.  He made no corrections or clarifications to any answers given. [Doc. 49 at 2].

Fed. R. Civ. P. 30(e) allows a deponent up to thirty days after a transcript of the deposition is available to review the transcript and, if there is a need to make changes in form or substance, to

list the changes and the reasons for making them.

In this case, Vigil did not seek to correct any response or ever assert that poor memory or medication caused him to misapprehend or misunderstand any question.

### Analysis

This case is similar to Chavez v. City of Albuquerque, 402 F.3d 1039 (10th Cir. 2009).  In Chavez, Judge William P. Johnson dismissed a plaintiff's 42 U.S.C. § 1983 lawsuit when evidence was presented that the plaintiff, Nestor Chavez, testified at trial and admitted that he had lied during his deposition and pretrial discovery.  His courtroom testimony was at odds with his prior sworn statements.  [Memorandum Opinion and Order, D.N.M., Aug. 18, 2003, Doc. 170, in case number 00cv307 WJ/LAM].

So, too, in the present case, Vigil acknowledges the accuracy and truthfulness of Defendants' factual representations about his pretrial statements.  He does not contest a single representation or statement in Silva and Stone's motion to dismiss.  In other words, while Defendants argue that Vigil, under oath, made material misrepresentations in his answers to interrogatories and in his deposition testimony, as outlined in the foregoing exhibits, Vigil does not deny making those his representations.  He contends only that due to injuries suffered at the hands of police or due to medication, he has a failed memory and, therefore, did not intentionally lie.  [*See* Doc. 48 at 6-7].  Yet, no expert medical testimony or report supports that claim.

In Chavez, the trial judge concluded that plaintiffs, "willful deceit . . . made a mockery of the judicial process."  Id. at 5 (*citing* Chambers v. Nasco, Inc., 501 U.S. 32, 44 (1991)(tampering with the administration of justice "is a wrong against the institutions set up to protect and safeguard the public"); *see also* Hazel v. Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 246 (1944); ABF Freight Systs, v. NLRB, 510 U.S. 317, 326 (1984)("the greatest consequence of lying under

oath is the affront to the law itself"). Finding Chavez's lies and misconduct to be an affront to the

truth-finding process, the judge dismissed the lawsuit as a sanction.

Chavez appealed the dismissal of his case, and the Tenth Circuit affirmed, stating:

> It has long been understood that "[c]ertain implied powers must necessarily result to our courts of justice from the nature of their institution," powers "which cannot be dispensed with in a court because they are necessary to the exercise of all others." Chambers v. Nasco, Inc. 501 U.S. 32, 43, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991)(*quoting* United States v. Hudson, 7 Cranch 32, 34, 3 L. Ed 259 (1812); *see also* Smith v. Northwest Financial Acceptance, Inc., 129 F.3d 1408, 1419 (10th Cir. 1997). Among the multifarious manifestations of the court's inherent powers is the authority to vacate a judgment when a fraud has been perpetrated on the court, Chambers, 501 U.S. at 44, 111 S. Ct. at 2132, such as when a party has perjured himself during the discovery process. Archibeque v. Atchison, Topeka & Santa Fe Railway Co, 70 F.3d 1172, 1174 (10th Cir. 1995.

Chavez v. City of Albuquerque, 402 F.3d at 1043-44.

Chavez authorizes a trial court to impose a sanction, even the most severe sanction of

dismissal, when the court concludes that a party lied during discovery or at trial, and a fraud was

perpetrated on the court. *See* Archibeque, 70 F.3d at 1174-75.

In that regard, Tenth Circuit law is consistent with New Mexico's own substantive judicial

decisions. In Sandoval v. Martinez, 109 N.M. 5, 78 P.2d 1152 (Ct. App. 1989), Judge Harris Hartz

(then a judge on the New Mexico Court of Appeals; now a Tenth Circuit judge) affirmed the state

district court's dismissal of Deborah Sandoval's lawsuit on the ground that Sandoval lied in answers

to interrogatories.

That case is especially instructive.[6]  Sandoval sued for injuries to her neck, back and legs, allegedly suffered in an automobile accident.  Sandoval, 78 P.2d at 1153.  During formal discovery, Sandoval was asked if she had ever been in a prior automobile accident and whether she had ever undergone surgery prior to the accident giving rise to her current lawsuit.  In her written response, under oath, she wrote "N/A" (not applicable) to these questions, and during her deposition when asked if she had ever received traffic citations in the five preceding years, she denied receipt of citations by answering, "No."  Id.

As with Vigil in the present case, Sandoval was afforded an opportunity to supplement, correct or explain her interrogatory answers, but made no changes.  Sandoval, 78 P.2d at 1153.  Defendants subsequently obtained medical records and learned that Sandoval sustained injuries in two prior and separate automobile accidents.  One accident resulted in Sandoval undergoing surgery.  Sandoval, 78 P.2d at 1154.  Defense counsel also learned that contrary to Sandoval's representations concerning an absence of traffic citations, she had, in fact, received speeding tickets.  Id.

Defendants moved for a Rule 37 sanction, contending that Sandoval failed to meet her discovery obligations, and, in bad faith, she provided false answers.  The trial court agreed and dismissed Sandoval's case.

On appeal to the New Mexico Court of Appeals, the panel considered whether Sandoval's lawsuit should have been dismissed due to the false answers provided during the course of formal discovery.  The Court of Appeals affirmed.  In its analysis, the court referred to New Mexico's

---

[6]Sandoval is not binding precedent, as it is a decision from the State of New Mexico Court of Appeals, and deals with state rather than federal law.  However, the policy considerations enumerated in Sandoval are compelling.

seminal discovery sanction case, United Nuclear Corp. v. General Atomic Co., 96 N.M. 155, 629 P.2d 231 (1980), where the trial court entered a default judgment against a defendant as a sanction for obstructing discovery.[7]  The defendant had not provided false answers to interrogatories, but, instead, resisted discovery and, in the language of the court, "stonewalled," and failed to provide requested information.  The trial court determined that defendant's conduct was wrongful and obstructed the court process, and it entered a default judgment in favor of United Nuclear, the party which sought discovery as against defendants.  *See* id. at 237.

Relying primarily on federal law, *e.g.*, Evanson v. Union Oil of California, 85 F.R.D. 274 (D. Minn. 1979), Hunter v. International Systems and Controls, 56 F.R.D. 617 (W.D. Mo. 1972), and Life Music, Inc. v. Broadcast Music, Inc., 41 F.R.D. 16 (S.D.N.Y. 1966), the New Mexico Supreme Court affirmed and authorized imposition of this most severe sanction for the defendant's discovery abuse.

The Sandoval court adopted the United Nuclear analysis and noted that Deborah Sandoval's providing false information was worse than the defendant's conduct in United Nuclear, where the defendant's stonewalling resulted in no information being provided.

> An interrogatory answer that falsely denies the existence of discoverable information is not exactly equivalent to no response.  It is *worse* than no response.  Where there is no response to an interrogatory or the response is devoid of content, the party serving the interrogatory at least knows it has not received an answer.  It can move the court for an order to compel a response pursuant to Rule 1-037(A).  If the response is false, however, the party serving the interrogatory may never learn that it has not really received the answer to the interrogatory.  The obstruction to the discovery process is much graver when a parties denies having had a prior accident than when the party refuses to respond to an interrogatory asking if there have been any prior accidents.

_____

[7]The default was startling because claimed damages were in the hundreds of millions of dollars.

Sandoval, 109 N.M. at 8-9 (emphasis added).

Such is the case here.  Vigil lied about his criminal history.  Vigil's denials that he signed plea agreements or that he was convicted in prior cases are all untrue.  In a startling act of bravado, he denied knowing Judith Jill Vigil, a victim of his abuse, and then claimed he had only met her once, finally contending that she was married to his brother.  We then find out that Vigil and Judith Jill Vigil were married and subsequently divorced, and that his prior statements about Judith Jill Vigil were all lies.

One need not be an expert handwriting analyst to make comparisons of the signatures.  *See* United States v. Saady, 393 F.3d 669, 673 (6th Cir. 2005) (laypeople capable of assessing or comparing handwriting exemplars with known handwriting material).  Even to a layman, it is apparent that the signatures on all of the above-described plea agreements and guilty plea proceedings, whether signed "Anthony Vigil" or "Tony Vigil," were executed by the same person in the same hand.  The writing style, curvature of letters, capitalization of the "V" and many other writing characteristics are identical.  Similarly, the fingerprint evidence shows that the fingerprints taken all the prior state cases , whether the defendant was identified as Anthony Vigil or Tony Vigil, belong to the same person–the Plaintiff in this case.  Forensic scientist Becky Archuleta concluded as much.

According to Vigil's interrogatory answers and deposition testimony, save for one fraud or forgery charge, and a few minor arrests for speeding, he has lived a virtually exemplary life.  Yet, the undisputed criminal history and records of convictions and plea and disposition agreements indicate that Vigil has a substantial criminal history, including felony convictions and more than one habitual offender proceeding.  All of Vigil's claims that the crimes were actually committed by his brother are simply untrue.

Vigil's statements were the kinds of lies that cannot be attributed to forgetfulness or loss of memory due to medication.  To believe that Vigil simply forgot his criminal history or forgot that the victim of one of his crimes was his spouse, who first obtained a restraining order against him and then subsequently petitioned for dissolution of marriage, requires a Coleridgian "suspension of belief." [8]  For Vigil to state, under oath, that he did not know Judith Jill Vigil, or later to state that she was married to his brother, defies credulity.

In Sandoval, adopting the state supreme court's analysis in United Nuclear v. General Atomic, Judge Hartz wrote:

> When a party has displayed a willful, bad faith approach to discovery, it is not only proper, but imperative, that severe sanctions be imposed to preserve the integrity of the judicial process and the due process of other litigants.  United Nuclear Corp. v. General Atomic, 96 N.M. at 241, 629 P.2d at 317.  District courts have a *duty* to enforce compliance with rules of discovery and they should not shirk from imposition of the sanction of dismissal.

Sandoval, 109 at 9 (emphasis in original).

Such is the case here.  To preserve the integrity of the court process and to ensure that "the search for truth" is more than a hollow phrase, sanctions are required.  However, before a sanction of dismissal is imposed, the Court must conduct an analysis under our circuit's decision in Ehrenhaus v. Reynolds, 965 F.2d 916, 920 (10th Cir. 1992).  Ehrenhaus sets out five considerations.

### Degree of Prejudice to Opposing Parties

First, the Court must inquire whether Vigil's misstatements prejudiced Defendants.  Judge Hartz provides the answer to that question.  As he noted in Sandoval, it is far worse to give a false

---

[8] This phrase, introduced by the writer Samuel Coleridge in Ch. XIV of Biographia Literaria, describes a voluntary withholding of skepticism on the part of a reader with regard to incredible events.  J. A. Cuddon, A Dictionary of Literary Terms and Literary Theory 1044 (3d Ed. 1991).

answer to a question than to give no answer at all because when a false answer is given, an examining attorney does not know the answer is false, and is accordingly misled.  If no answer is given, the need for further examination is apparent and such examination will be pursued.  The mere giving of a false answer interferes with Defendants' ability to carefully analyze and evaluate, and, thus, causes prejudice.

Defendants were prejudiced because of the material misstatements of fact, which have now been acknowledged.  Vigil interfered with Defendants' ability to seek dismissal on the basis of qualified immunity inasmuch as the misrepresentations rise to the level of disputed issues of fact that would preclude summary judgment.

The defense strategy in this case was to show that Vigil was the same individual who evaded arrest 11 days prior to the underlying incident on a outstanding warrant.  The arrest warrant and prior incident gives a credible explanation to Stone and Silva's representation that Vigil fled during a traffic stop.  Vigil denied he was the individual being sought, contending that it was his brother.  Thus, the lie tends to undercut the defense theory.  Vigil created a factual issue which interfered with Defendants' ability to seek dismissal under Graham v. O'Connor, 490 U.S. 386 (1989).

Vigil's untruthfulness interferes with Defendants' ability to prepare for trial.  The existence of a prior warrant for Vigil's arrest gives the fact finder an explanation as to why Vigil sought to evade the officers and escape from their custody on the night in question.  It makes the likelihood of the officers' statements more credible, and offers a legitimate explanation as to Vigil's attempts to resist or evade arrest.  It is clear that Vigil's untruthfulness in formal discovery prejudiced Defendants.

**Interference With the Judicial Process**

Discovery is a means of ascertaining the existence of facts relating to parties' claims and defenses. It is through the discovery process that the parties are able to (1) evaluate the strengths and weaknesses of claims, (2) determine whether a case should be settled; or (3) if settlement is not possible, to better prepare to meet the proofs at the time of trial. *See, e.g.*, Johnson v. City of Tulsa, 2003 WL 24015151 (N.D. Okla. May 12, 2003) (discovery process allows parties to evaluate strengths and weaknesses of claims and defenses).

Vigil placed no value in the truth-finding process. In Sandoval, Judge Hartz indicated that a court must preserve the integrity of the trial process, and in doing so, it preserves the due process rights of all the parties. Judge Hartz noted that courts have an affirmative duty to enforce compliance with rules of discovery, and a court should not be afraid to impose the sanction of dismissal when there is willfulness or bad faith adherence to discovery obligations.

Vigil's lies compelled the Court to consider this most unusual motion, a task that would not have been required had Vigil simply and truthfully answered pretrial discovery. This present motion was made necessary by Vigil's willful misconduct and bad faith, and required the Court to devote to its resolution time that would not otherwise have been necessary.

Vigil played "fast and loose" with the court process and his misstatements of fact interfered with the judicial process as a whole. As in Sandoval, it is incumbent on the Court to uphold the integrity of the process and to compel parties who engage in such intentional misconduct to suffer the appropriate consequences of their misbehavior.

## **Culpability of the Litigant**

When a sanction is appropriate, the Court must determine whether the sanction should be

imposed on counsel or on a litigant.[9]  Here, there is no indication that Vigil's present attorney knew that his client provided false answers to interrogatories or during his deposition.  Indeed, had he known of the misstatements, the attorney would certainly not have countenanced this conduct.

A sanction should penalize the appropriate party.  In re Sanction of Baker, 744 F.2d 1438, 1442 (10th Cir. 1984); see also M.E.N. Co. v. Control Fluidics, Inc., 834 F.2d 869, 873 (10th Cir. 1987).  If it is the attorney who violated obligations, then it is the attorney who should suffer the sanction.  However, when it is the party who is responsible for the violation, the consequences are laid at the violator's feet.

In this case, Vigil's attorney is blameless.  It was Vigil who told multiple lies.  As it is Vigil who lied, it is therefore Vigil who should suffer the consequences.

## Advance Warning of Possible Dismissal

Vigil argues that the factors in  Ehrenhaus are not present, and primarily because the Court did not previously warn Vigil that lying while under oath could result in dismissal of his case, it would be inappropriate to dismiss the lawsuit.  The short answer to that objection is that our circuit flatly rejected that same argument.  The Tenth Circuit said in Chavez v. City of Albuquerque:

> With respect to the factor of whether a prior warning was necessary before the case was dismissed, the Court noted that because the perjurious testimony was given under oath, an additional warning would have been superfluous.  "Once a witness swears to give truthful answers, there is no requirement to warn him not to commit perjury or, conversely, to direct him to tell the truth.  It would render the sanctity of the oath quite meaningless to require admonition to adhere to it.  *Citing* Webb v. Texas, 409 U.S. 95, 97 n.* , 93 S. Ct. 351, 353 n.* (1972).

---

[9]Vigil's present attorney only recently undertook representation. [Doc. 29].  Vigil was previously represented by another attorney who was suspended from the practice of law.  In Re D.M., New Mexico Supreme Court No. 32, 397 (N.M. April 25, 2011).  Vigil's present attorney took over  number of cases for the suspended attorney, including this present case.

Chavez v. City of Albuquerque, 402 F.3d at 1045.

Therefore, while no prior warning was given, the violation is of such a grievous nature that no advance warning is required.  Moreover, while all five Ehrenhaus factors must be considered, it is not required that all be present in a particular case; instead, it is a weighing-and-balancing-of-the-factors analysis.  *See* Hardage v. James, 211 F.3d 1278 (10th Cir. 2000).

**Efficacy of Lesser Sanctions**

Finally, the Court must determine whether there is a lesser sanction that can be imposed other than the most severe sanction of dismissal.  Chambers instructs that when fraud has been perpetrated on the court as a result of perjury during the discovery process, the most severe sanction is warranted.  *See* Chambers, 501 U.S. at 44; *see also* Archibeque, 70 F.3d at 1174-75.

Given the seriousness of the misconduct, the number of misstatements made and Vigil's failure, prior to the present motion, to attempt any correction or clarification, it is not likely that a lesser sanction would compel Vigil to give truthful testimony in the future.  Indeed, even at this juncture, Vigil offers no remorse or apology.  He does not own up to his blatant misrepresentations, but simply says it is not really his fault, and that his memory lapse is due to the officers' conduct.

**Conclusion**

After consideration of the Ehrenhaus standards, the Court determines that the appropriate sanction for the multiple pretrial misrepresentations is dismissal of this action with prejudice.

IT IS SO ORDERED.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge